UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITE HERE RETIREMENT FUND, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN JOSE, et al.,<br><br>Defendants. | Case No.   5:20-cv-06069-EJD<br><br>**ORDER RE MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 95, 97, 100 |

This matter comes before the Court on a dispute regarding a withdrawal liability imposed by the Employee Retirement Income Security Act ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). The MPPAA requires an employer withdrawing from a multiemployer pension plan to pay the unfunded vested benefits attributable to the withdrawing employer's participation in the plan. *Resilient Floor Covering Pension Fund v. M&M Installation, Inc.*, 630 F.3d 848, 851 (9th Cir. 2010). At least one of Defendants City of San Jose (the "City") and Dolce International/San Jose, LLC ("Dolce International") incurred such a liability when withdrawing from a multiemployer plan maintained by Plaintiffs Unite Here Retirement Fund and Trustees of the Unite Here Retirement Fund (collectively, "Unite Here"), but the parties disagree over who is responsible for paying that liability.

Now before the Court are three separate cross-motions for summary judgment. The City moved for summary judgment that Dolce International is the employer responsible for paying the

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT

1

withdrawal liability.[1] Dolce International moved for summary judgment that it is not responsible for the withdrawal liability. And Unite Here moved for summary judgment that Dolce International is responsible or, in the alternative, that the City is responsible. After careful consideration of the parties' briefs and the record in this matter, the Court determined that these motions were suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b). For the reasons that follow, the Court DENIES the City's motion, DENIES Dolce International's motion, and GRANTS IN PART and DENIES IN PART Unite Here's motion.

## I. BACKGROUND

From at least 2003 through early 2019, the City owned a hotel and conference center known as the Hayes Mansion. Stipulation, Ex. A ("Amended Joint Statement of Undisputed Facts" or "JSUF") ¶¶ 4, 6, ECF No. 98. The City contracted with Dolce International to manage and operate the facility, and the two memorialized this arrangement in a Management Agreement that they executed in December 2003. *Id.* ¶ 7; Joint App., ECF No. 93, Ex. A ("Management Agreement"). Under the terms of the Agreement, Dolce International was required to carry out certain responsibilities "on the [City's] behalf," including the responsibilities to:

> 2.4(i) unless otherwise directed by [the City], pay all Operating Expenses when due[, including pension contributions (*see* JSUF ¶¶ 52–54; Management Agreement ¶ 1.35(a))];
>
> * * *
>
> 2.4(p) negotiate for the best interest of the [City] with any labor unions representing employees of the [Hayes Mansion], and . . . consult with the [City] in advance of, and, to the extent practicable, during the course of, negotiations with any labor union; [and]
>
> * * *
>
> 2.4(v) comply with all provisions of any collective bargaining (or similar) agreement [(*see also* JSUF ¶ 51)].

Management Agreement ¶¶ 2.4(i), (p), (v).

---

[1] The City raises for the first time in its opposition that the pension plan is a government plan exempt from ERISA. City Opp'n at 13–14, ECF No. 102. Because the City presents that argument as an affirmative basis for shielding itself from withdrawal liability, it should have raised the defense in its motion. Therefore, it is procedurally improper for the Court to consider that defense in this Order.

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT
2

During the period when Dolce International managed the Hayes Mansion, certain employees at the Hayes Mansion were subject to a series of collective bargaining agreements ("CBAs") between their local union and "Dolce Hayes Mansion," which is a fictitious business name first registered by the City but later refiled by Dolce International. JSUF ¶ 15–16; Req. for Judicial Not., Ex. A, ECF No. 97-6[2]; Decl. of Matthew J. Goodman, Ex. 1, ECF No. 101-2. As relevant here, the CBA covering the period from July 2012 to December 2016, and a letter agreement extending that CBA, were both signed by Yves Hansel, an employee of Dolce International who worked at the Hayes Mansion. *Id.* ¶¶ 56–57; Decl. of Yves Hansel in Support of Dolce International's Mot. ¶ 1, ECF No. 97-4. These two agreements obligated "Dolce Hayes Mansion" to contribute to the Unite Here multiemployer pension plan as well as Unite Here's predecessor fund. JSUF ¶¶ 1, 18. When the City sold the Hayes Mansion in early 2019, the obligation to contribute to the Unite Here multiemployer pension plan was terminated, thereby triggering a withdrawal liability. *Id.* ¶¶ 24–25.

## II.   LEGAL STANDARD

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if there is sufficient evidence for a reasonable fact finder to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And that dispute is material if it might affect the outcome of the suit. *Id.* When analyzing whether a genuine dispute of material fact exists, a court must "tak[e] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party."

---

[2] Dolce International requests judicial notice of three documents: a fictitious business name statement filed by the City with the county recorder (Exhibit A); a glossary of budgetary terms from the City's website (Exhibit B); and an advisory opinion by the Pension Benefit Guaranty Corporation (Exhibit C). ECF No. 97-6. The Court GRANTS Dolce International's request but notes that it does not rely on Exhibits B or C because it does not find them relevant to this Order. *See Mulhall v. Wells Fargo Bank, N.A.*, 241 F. Supp. 3d 1046, 1050 (N.D. Cal. 2017) (finding documents filed with county recorder were properly subject to notice); *Johnson v. DTBA, LLC*, 424 F. Supp. 3d 657, 662 (N.D. Cal. 2019) (noticing public records on government websites); *Cork v. CC-Palo Alto, Inc.*, 534 F. Supp. 3d 1156, 1171–72 (N.D. Cal. 2021) (taking notice of opinion letter from government agency).

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT

3

*Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). If, however, "divergent ultimate inferences may reasonably be drawn from the undisputed facts," summary judgment is improper. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citation omitted).

### III.   DISCUSSION

The MPPAA imposes a withdrawal liability on any "employer" that withdraws from a multiemployer pension plan. *Resilient Floor*, 630 F.3d at 851 (citing 29 U.S.C. § 1381). Although the statute does not define "employer," the Ninth Circuit has held that, for purposes of withdrawal liability under the MPPAA, an "employer" is "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Id.* (collecting cases). In turn, the MPPAA defines "obligation to contribute" as an obligation arising either "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law," but excluding obligations to pay withdrawal liabilities or delinquent contributions. 29 U.S.C. § 1392(a). In this case, where the parties have identified no applicable labor-management relations law, the dispositive issue is whether the City or Dolce International is bound to contribute to the Unite Here plan under the CBA.

In many cases, that question may be easy to answer—the signatory to any collective bargaining agreement is bound by the agreement and is therefore the "employer." *See Resilient Floor*, 630 F.3d at 852 (observing that the signatory entity was the "employer"). But the facts here are not so straightforward because, even though an employee of Dolce International signed the CBA, Dolce International argues that it was acting as the City's agent. Dolce Int'l's Mot. for Summary J. ("Dolce MSJ") at 15–16, ECF No. 97-1. According to Dolce International, this means that the City held the contractual obligation to make pension contributions such that the City is responsible for the withdrawal liability in this case. *Id.*

The issues of agency identified by Dolce International raise several questions relevant to the Court's analysis. First, does ERISA permit an agent to bind its principal to a withdrawal

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT
4

liability? Second, was there a principal-agent relationship between the City and Dolce International? Third, if an agency relationship existed, was Dolce International acting within its authority? And finally, if Dolce International was acting within the scope of its authority when it signed the CBA, who was obligated under the CBA? The Court addresses each in turn.

### A.    Effect of an Agency Relationship on ERISA Withdrawal Liability

The City asserts that, even if Dolce International was acting as its agent, it could not be bound by Dolce International's actions for purposes of withdrawal liability. It makes two arguments to that effect, but neither is availing.

First, the City argues that "[t]he Ninth Circuit has declined to expand the liability for ERISA pension contributions to a party who was not the signatory to the collective bargaining agreement." City's Opp'n to Dolce MSJ at 9, ECF No. 102. In so arguing, the City seems to suggest that the definition of "employer" requires a party to directly sign the collective bargaining agreement. But that is not in line with the Ninth Circuit's definition of "employer" as one who is "*obligated* to contribute to a plan." *Resilient Floor*, 630 F.3d at 851 (emphasis added). Although the Ninth Circuit also recognized that a signatory to the agreement would be an employer, it never stated that *only* signatories can be employers. *See id.* at 852.

The City's cited authorities do not aid it in overcoming *Resilient Floor*. For example, the City cites to *Carpenters Southern California Administrative Corp. v. Majestic Housing*, 743 F.2d 1342 (9th Cir. 1984), for the proposition that only signatories can be liable for ERISA pension contributions. City's Opp'n to Dolce MSJ at 9. *Majestic Housing*, though, relies on the definition of "employer" under Title I of ERISA. *Id.* at 1345–46 (citing definition at 29 U.S.C. § 1002(5)). The Ninth Circuit has explained that the Title I definition "does not apply directly to Title IV [of ERISA], which contains [the] MPPAA" and withdrawal liability provisions. *Resilient Floor*, 630 F.3d at 851. Indeed, the definition of "employer" under Section 1002(5)—"any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan"—is very different than the definition of "employer" that the Ninth Circuit adopted for purposes of withdrawal liability, which focuses on obligations to contribute. *Compare* 29

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT
5

U.S.C. § 1002(5), *with Resilient Floor*, 630 F.3d at 851. As such, *Majestic Housing* is inapposite.

Nor does *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for Northern California*, 859 F.2d 808 (9th Cir. 1988), help the City's cause. While the court there stated that, with regards to withdrawal liability, "[t]he word 'employer' describes one who was a signatory employer with respect to the plan," *id.* at 813, *Resilient Floor* makes clear that the *H.C. Elliott* definition applied "in the different context of whether a company remained an employer after it stopped employing people." *Resilient Floor*, 630 F.3d at 852 n.4. *H.C. Elliott* is therefore also inapposite in this case, where the question is whether the City or Dolce International was the employer in the first instance.

The City's remaining cases fare no better. *See Trs. of Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 773 (9th Cir. 2009) (not addressing whether an agent could bind principal to make contributions); *Carpenters Health & Welfare Tr. Fund for N. Cal. v. Shirley Constr., Inc.*, 972 F.2d 1337 (9th Cir. 1992) (unpublished decision that is not citable under Ninth Circuit Rule 36-3). And in fact, one of its cases recognizes that a non-signatory can be bound "by the [CBA] negotiated [o]n its behalf" such that it would be "an employer subject to withdrawal liability." *Div. 1181 A.T.U.-N.Y. Emps. Pension Fund by Cordiello v. City of N.Y. Dep't of Educ.*, 910 F.3d 608, 615 (2d Cir. 2018) (second alteration in original) (quoting *Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 262 (2d Cir. 1990)). Consequently, the Court finds that an agent can obligate its principal to a CBA such that the principal is responsible for a withdrawal liability.

Second, the City suggests that, even if the definition is focused on obligations rather than signatory status, ERISA does not permit an agent to obligate its principal to pay a withdrawal liability. City's Reply at 7–9, ECF No. 110. For this argument, it relies on the Eighth Circuit's decision in *Seaway Port Authority of Duluth v. Duluth-Superior ILA Marine Association Restated Pension Plan*, 920 F.2d 503 (8th Cir. 1990). In *Seaway*, the Port Authority argued that it was not an employer under MPPAA, but rather its managing agent was the employer responsible for a withdrawal liability. *Id.* at 510. The court agreed, but it did so based on a Minnesota state law

that explicitly delimited the Port Authority's relationship with its managing agents. *Id.* Specifically, the law provided that "the agent is responsible to pay the employees and to comply with . . . federal laws affecting the employees," expressly placing the obligation for complying with laws such as the MPPAA in the hands of the Port Authority's managing agent. *Id.* (quoting Minn. Stat. § 469.055(11) (1990)). So, far from presenting a sweeping holding that agents can never bind their principals to pay a withdrawal liability, *Seaway* stands only for the notion that state agency law may remove the power to obligate a principal under ERISA from the scope of an agent's authority. Because the parties have not identified a comparable state law in this case, the Court finds that it is possible for an agent of the City to obligate the City to pay the withdrawal liability.

### B. Existence of a Principal-Agent Relationship

Having concluded that the City *can* be bound by its agent, the Court turns to whether Dolce International *was* the City's agent. The basic notion of an agency relationship is that one entity, called the agent, represents another, called the principal, in dealings with third parties. *Rogers v. Roseville SH, LLC*, 75 Cal. App. 5th 1065, 1074 (2022) (citation omitted). The agent has "the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties." *McCollum v. Friendly Hills Travel Ctr.*, 172 Cal. App. 3d 83, 91 (1985).

One type of agency is known as "actual agency," and such a relationship is formed "when the principal's conduct causes the agent reasonably to believe that the principal consents to the agent's act on behalf of the principal." *Rogers*, 75 Cal. App. 5th at 1074 (citing *Tomerlin v. Canadian Indem. Co.*, 61 Cal. 2d 638, 643 (1964)). To form an actual agency, the "principal must in some manner indicate that the agent is to act for [the principal], and the agent must act or agree to act on [the principal's] behalf and subject to [the principal's] control." *Id.* (alterations in original) (quoting *Flores v. Evergreen at San Diego, LLC*, 148 Cal. App. 4th 581, 588 (2007)). Put another way, "[w]ords or conduct by both principal and agent are necessary to create the relationship." *Id.* (quoting *Flores*, 148 Cal. App. 4th at 588).

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT
7

Applying these principles, courts have regularly recognized that property management agreements of the type between the City and Dolce International create an agency relationship. *See, e.g.*, *Burton Way Hotels, Ltd. v. Four Seasons Hotels Ltd.*, 663 F. App'x 567, 569 (9th Cir. 2016) (hotel management agreement); *Tehrani v. Joie De Vivre Hosp., LLC*, 2020 WL 5408120, at *1 (N.D. Cal. Sept. 9, 2020) (hotel management agreement); *Monterey Bay Military Housing, LLC v. Pinnacle Monterey LLC*, 116 F. Supp. 3d 1010, 1025–26 (N.D. Cal. 2015) (property management agreement), *vacated in part on other grounds*, 2015 WL 4624678 (N.D. Cal. Aug. 3, 2015); *Woolley v. Embassy Suites, Inc.*, 227 Cal. App. 3d 1520, 1525, 1529–33 (1991) (hotel management agreement). The reason for this is because the role of an agent is to "*manage some affair*, for another, by authority of and on account of the latter," meaning that "the very nature of a managerial relation is to delegate authority from principal to agent." *Woolley*, 227 Cal. App. 3d at 1531.

Here, while the City disputes whether Dolce International's agency theory binds it to the CBA, it never truly contests the existence of an agency relationship between the two of them. Nor could it, as on the factual record before the Court, there can be no genuine dispute that Dolce International was an agent of the City. Although the Management Agreement does not expressly refer to Dolce International as an agent of the City, it makes clear that Dolce International was to act "on the [City's] behalf." Management Agreement ¶ 2.4. Moreover, it delegates broad authority to Dolce International to carry out various tasks—including managing and advertising the Hayes Mansion, procuring necessary licenses, and entering into contracts for services and supplies—integral to operating the Hayes Mansion for the City's benefit. *Id.* ¶¶ 2.4(a)–(bb). Courts in this district have found similar delegations to form an agency. *See Monterey Bay*, 116 F. Supp. 3d at 1026 (finding that an agency was established when property owners delegated authority to, *inter alia*, advertise, lease, operate, select vendors, and obtain insurance). And the Court agrees that the facts in this case lead to the same conclusion. In executing the Management Agreement, the City indicated that Dolce International was required to act for the City, and Dolce International agreed to do so. That is sufficient to form a principal-agent relationship between the

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT

8

two. *See Rogers*, 75 Cal. App. 5th at 1074.

Consequently, the Court finds that Dolce International was an agent of the City.

### C.     Scope of Dolce International's Authority

Next, the Court determines the scope Dolce International's authority and whether it was acting within the scope of that authority when it signed the CBA.

Dolce International plainly had the authority to carry out the tasks that were specifically enumerated in Paragraph 2.4 of the Management Agreement. But actual authority is not limited to express grants of authority—it "may be implied as well as express." *Transport Clearings-Bay Area v. Simmonds*, 226 Cal. App. 2d 405, 425 (1964) (citing *Hobart v. Hobart Est. Co.*, 26 Cal. 2d 412, 450 (1945)). There are two sources of actual implied authority. First is the "very broad" authority of a general agent or manager that "embrac[es] . . . all acts customarily connected with the business in which he is engaged." *Id.* (quoting *Hobart*, 26 Cal. 2d at 450). Second, "[a]n agent has implied authority to use any means that are incidental to and reasonably proper in the performance of an assigned task." *Garber v. Prudential Ins. Co. of Am.*, 203 Cal. App. 2d 693, 701 (1962) (citations omitted). Even if an action is "an entirely different kind of act" than an expressly authorized one, it still falls within the scope of this category of implied authority if it (a) "is subordinate to or pertinent to an [expressly authorized] act" and (b) is "within the ultimate objective of the principal." *Id.* at 702 (quoting Restatement (Second) of Agency § 229 cmt. b). It does not matter that a principal "has no reason to expect the particular [agent] to perform the act" as long as the act is one which "is not unlikely that such [an agent] might do." *Id.* (quoting Restatement (Second) of Agency § 229 cmt. b).

There is nothing in the Management Agreement that expressly authorizes Dolce International to sign the CBA on behalf of the City, so the only potential source of authority for that action is implied. The record is devoid of evidence regarding how the hotel industry customarily interacts with unions, so the Court cannot conclude on summary judgment that Dolce International was acting within the first category of actual implied authority. However, the Court can conclude that signing the CBA on behalf of the City falls within the second category of actual

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT
9

implied authority: acts incidental to expressly assigned tasks.

Many of the tasks that the City expressly delegated to Dolce International relate to issues of collective bargaining. Under the Management Agreement, Dolce International was required to comply with any collective bargaining agreements and pay operating expenses, including expenses owed under the CBA, on behalf of the City. Management Agreement ¶¶ 1.35(a); 2.4(i), 2.4(v); JSUF ¶¶ 52–54. And significantly, Dolce International had the express authority to "negotiate for the best interest of the [City] with any labor unions representing employees of the [Hayes Mansion]." Management Agreement ¶ 2.4(p). The authority to sign the CBA on behalf of the City is undoubtedly incidental to the authority to negotiate the CBA on behalf of the City, especially in the context of the other express authorities relating to the CBA. There is no doubt that signing the CBA is at least "pertinent" to negotiating the CBA. And when considering the City's express delegations as a whole, the only reasonable inference is that the City's "ultimate objective" was to ensure that a collective bargaining agreement was in place for employees working at the Hayes Mansion. Signing the CBA on the City's behalf falls "within" that objective; indeed, given that Dolce International already had the express authority to negotiate the CBA on the City's behalf, authorizing Dolce International to also sign the CBA on the City's behalf—a relatively ministerial task entailing much less discretion than negotiations—is a natural, implied extension of the authority to negotiate.

Accordingly, the Court finds that there is no genuine dispute that it was within the scope of Dolce International's authority sign the CBA on behalf of the City.

### D. Determining the "Employer"

Since the Court has found that Dolce International was acting as the City's agent within the scope of its authority when signing the CBA, all that remains is to determine who was bound by the CBA.

The general rule is that, when an agent signs a contract with a third party on behalf of a principal that is disclosed, that principal is liable on the contract, but the agent is not. *Sulimani v. Liberty Ins. Corp.*, 2021 WL 9057596, at *7 (N.D. Cal. July 20, 2021) (first citing *Cline v.*

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT
10

1   *Atwood*, 241 Cal. App. 2d 108, 113 (1966); and then citing *Lippert v. Bailey*, 214 Cal. App. 2d

2   376, 382 (1966)).  But, if the identity of the principal is undisclosed, the calculus changes.

3   Although "a contract made by an agent for an undisclosed principal is . . . the contract of the

4   principal, it also may be considered the contract of the agent."  *Stephan v. Maloof*, 274 Cal. App.

5   2d 843, 850 (1969).  As such, "*either* the principal *or* the agent may be held liable on [the

6   contract]."  *Aluma Sys. Concrete Constr. of Cal. v. Nibbi Bros. Inc.*, 2 Cal. App. 5th 620, 628

7   (2016) (citation omitted) (emphasis added).

8         At the outset, the Court observes that a principal is considered a party to the contract

9   regardless of whether it was disclosed to the third party.  There is therefore no genuine dispute that

10  the City is obligated under the CBA, so the Court finds that the City is an employer responsible for

11  the withdrawal liability in this case.  By contrast, the question of whether Dolce International is

12  also an employer (and thus jointly responsible for the withdrawal liability) turns on the issue of

13  disclosure.

14        Where the name of the principal appears on the face of a contract, the principal is

15  disclosed, and the agent is not bound by the contract.  *G.W. Anderson Constr. Co. v. Mars Sales*,

16  164 Cal. App. 3d 326, 333 (1985); *see also Lippert v. Bailey*, 241 Cal. App. 2d 376, 382 (1966)

17  ("Where the signature as agent and not as a principal appears on the face of the contract, the

18  principal is liable and not the agent.").  Here, there is no question that the City's name does not

19  appear on the CBA.  Both relevant CBA agreements disclose only that they were signed by or on

20  behalf of "Dolce Hayes Mansion," which is a fictitious business name.  Joint App., Exs. B, L;

21  JSUF ¶ 10.  The parties dispute whether that name referred to the City or Dolce International, but

22  that dispute is not material to the outcome of this case.  Disclosing only a fictitious business name

23  is insufficient as a matter of law to disclose the identity of the principal.  *W.W. Leasing Unlimited*

24  *v. Com. Standard Title Ins. Co.*, 149 Cal. App. 3d 792, 795–96 (1983); *see also Laatz v. Zazzle,*

25  *Inc.*, __ F. Supp. 3d __, 2023 WL 4600432, at *11 (N.D. Cal. July 17, 2023) ("[T]he use of a trade

26  name is not sufficient disclosure of the identity of the principal to protect the agent from personal

27  liability . . . .") (quoting *G.W. Andersen Construction Co. v. Mars Sales*, 164 Cal. App. 3d 326,

28  Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT
11

1   332–33 (1985)). So regardless of whether "Dolce Hayes Mansion" referred to the City or to Dolce

2   International, it would not have disclosed the identity of the City as principal.

3   That said, California courts have suggested that disclosing the identity of the principal

4   other than on the face of the contract (*e.g.*, by informing a third party of the principal's identity

5   during negotiations) also serves to insulate the agent from liability. *See G.W. Anderson*, 164 Cal.

6   App. 3d at 333. But there is nothing in the record—at least that the Court can consider on these

7   motions—showing whether or not that occurred here. While Dolce International offers a

8   declaration by Yves Hansel stating that he explicitly informed the union of the agency relationship

9   between the City and Dolce International, that declaration is evidence introduced for the first time

10  in reply. Decl. of Yves Hansel in Support of Dolce International's Reply ¶ 6, ECF No. 107-1. As

11  neither Unite Here nor the City had an opportunity to substantively respond to that declaration, the

12  Court does not consider it.[3] *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[W]here

13  new evidence is presented in a reply to a motion for summary judgment, the district court should

14  not consider the new evidence without giving the [non-]movant an opportunity to respond.")

15  (alteration in original). Without such evidence, the Court cannot determine if the City was

16  disclosed as the principal and cannot grant any summary judgment either for or against Dolce

17  International.

18  In sum, the Court concludes that there is no genuine dispute of material fact that the City

19  was bound by the CBA, so it is an employer under the MPPAA and responsible for the withdrawal

20  liability here. As to Dolce International, though, there are disputes of fact as to whether it was

21  also bound, so the Court cannot grant summary judgment on the claim against Dolce International.

22  **IV.   CONCLUSION**

23  For the reasons given above, the Court DENIES the City's motion, DENIES Dolce

24  International's motion, and GRANTS IN PART and DENIES IN PART Unite Here's motion.

25

---

[3] The City also raised various evidentiary objections against this declaration. Objections, ECF No. 112. The Court does not address those objections because it already declined to consider the declaration on other grounds.

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT
12

The effect is that the Court grants summary judgment in favor of Unite Here on its first claim against the City but cannot resolve Unite Here's second claim against Dolce International on summary judgment. Although Unite Here styled its claims in the alternative, the Court sees no reason—and the parties provide none—why the City and Unite Here may not be joint employers under ERISA.[4] This action will therefore proceed to determine if Dolce International was *also* obligated under the CBA such that it is a joint employer with the City for purposes of withdrawal liability.

**IT IS SO ORDERED.**

Dated: August 11, 2023

_____
EDWARD J. DAVILA
United States District Judge

---

[4] Under California agency law, a plaintiff suing on a contract where the principal was undisclosed can ultimately only have judgment against one of the agent and principal, and at some time it must make an election of which party to hold liable. 3 Witkin, Summary 11th Agency § 170 (2023). The Court leaves open the question, which the parties have not addressed, of whether this state rule also compels Unite Here to make an election of which defendant to hold responsible for the withdrawal liability here, in the event that Dolce International is also held to be an employer under the MPPAA in later proceedings.

Case No.: 5:20-cv-06069-EJD
ORDER RE MOTIONS FOR SUMMARY JUDGMENT
13